1

2

3

4

5

6

7                     **UNITED STATES DISTRICT COURT**

8                     **CENTRAL DISTRICT OF CALIFORNIA**

9

10   DEVIN JENKINS,                )        NO. EDCV 04-00125 (Mc)
                                    )
11                 Plaintiff,       )
                                    )
12           v.                     )        MEMORANDUM OF DECISION
                                    )        AND ORDER IN A SOCIAL
                                    )        SECURITY CASE
13   JO ANNE B. BARNHART,           )
     Commissioner of the           )
14   Social Security Administration,)
                                    )
15                 Defendant.       )
     _____)

16

17       The plaintiff, DEVIN JENKINS, filed the present action for review

18   of a final determination of the Commissioner of Social Security (the

19   "Commissioner") that he is not disabled and not entitled to Disability

20   Insurance Benefits ("DIB") and Supplemental Security Income ("SSI")

21   Benefits.  For the reasons set forth below, the court finds that there

22   is not substantial evidence in support of the decision of the

23   Commissioner.  The court, therefore, remands this matter to the

24   Commissioner for further proceedings.

25                         **BACKGROUND**

26       The plaintiff protectively filed applications for disability

27   insurance benefits and supplemental security income benefits under the

28   Social Security Act (the "Act") on December 1, 1999. [Administrative

Record ("AR") 12, 104-06, 300-01.]  The Commissioner denied the applications initially and on reconsideration. [AR 62-65, 68-72.] The plaintiff requested a hearing before an administrative law judge. [AR 73.] The request for hearing was dismissed due to untimely filing of the request [AR 60-61], but the matter was remanded by the Appeals Council [AR 79-81].  An administrative hearing was held on May 16, 2003, before Administrative Law Judge David M. Ganly (the "ALJ"). [AR 19-55.]  On June 27, 2003, the ALJ filed a decision concluding that the plaintiff was not under a disability as defined in the Act at any time through the date of the decision. [AR 11-15.]  The Appeals Council denied the plaintiff's request for review of the ALJ's decision. [AR 4-6.]  The decision of the ALJ stands as the final decision of the Commissioner.

Thereafter, the plaintiff filed the present action.  The plaintiff and the Commissioner have consented to proceed before a United States Magistrate Judge.  The parties have entered into a Joint Stipulation setting forth their arguments.

**STANDARDS OF REVIEW**

The court must sustain the findings of the Commissioner unless: (a) they are not supported by substantial evidence in the record as a whole; or (b) the Commissioner applied an improper legal standard. See 42 U.S.C. 405(g); Gordon v. Secretary of Health and Human Services, 803 F.2d 1071, 1072 (9th Cir. 1986).  Substantial evidence means "more than a mere scintilla" but less than a preponderance. Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971); Desrosiers v. Secretary of Health and Human Services, 846 F.2d 573, 576 (9th Cir. 1988).  "Substantial evidence" is evidence a "reasonable mind might accept as adequate to support a

1  conclusion." <u>Richardson v. Perales</u>, 402 U.S. at 402; <u>Gordon v.</u>

2  <u>Secretary of Health and Human Services</u>, 803 F.2d at 1072.

3      This court must review the record as a whole and consider adverse

4  as well as supporting evidence.  <u>See</u> <u>Green v. Heckler</u>, 803 F.2d 528,

5  529-30 (9th Cir. 1986).  Where evidence is susceptible of more than

6  one rational interpretation, the court must sustain the Commissioner's

7  decision.  <u>See</u> <u>Gallant v. Heckler</u>, 753 F.2d 1450, 1453 (9th Cir.

8  1984).

9                    **THE FIVE-STEP SEQUENTIAL EVALUATION**

10      The Commissioner has established a five-step sequential

11  evaluation for determining whether a person is disabled.  First, the

12  Commissioner determines whether the person is engaged in "substantial

13  gainful activity."  If so, the Commissioner denies disability

14  benefits.  Second, if the person is not so engaged, the Commissioner

15  determines whether the person has a medically severe impairment or

16  combination of impairments.  If the person does not have a severe

17  impairment or combination of impairments, the Commissioner denies

18  benefits.  Third, if the person has a severe impairment, the

19  Commissioner determines whether the impairment meets or equals one of

20  a number of "listed impairments."  If the impairment meets or equals a

21  "listed impairment," the Commissioner conclusively presumes that the

22  person is disabled.  Fourth, if the impairment does not meet or equal

23  the "listed impairments," the Commissioner determines whether the

24  impairment prevents the person from performing past relevant work.  If

25  the person can perform past relevant work, the Commissioner denies

26  benefits.  Fifth, if the person cannot perform past relevant work, the

27  burden shifts to the Commissioner to show that the person is able to

28  perform other kinds of work.  The person is entitled to disability

1  benefits only if he or she is unable to perform other work.  See 20

2  C.F.R. § 404.1520 and 20 C.F.R. § 416.920; <u>Bowen v. Yuckert</u>, 482 U.S.

3  137, 140-42, 107 S.Ct. 2287, 96 L.Ed 119 (1987).

4                       **PUBLIC LAW 104-121**

5  _____ Notwithstanding the above, "[a] finding of 'disabled' under the

6  five-step inquiry does not automatically qualify a claimant for

7  disability benefits. Under provisions added by the Contract with

8  America Advancement Act, Pub.L. No. 104-121, 110 Stat. 847 (March 29,

9  1996), an 'individual shall not be considered to be disabled for

10  purposes of [benefits under Title II or XVI of the Act] if alcoholism

11  or drug addiction would (but for this subparagraph) be a contributing

12  factor material to the Commissioner's determination that the

13  individual is disabled.'" <u>Bustamante v. Massanari</u>,  262 F.3d 949, 954

14  (9th Cir. 2001), quoting 42 U.S.C. § 423(d)(2)(C); <u>see also</u> <u>Sousa v.

15  Callahan</u>, 143 F.3d 1240, 1242 (9th Cir. 1998).  The key factor in

16  making the determination whether drug addiction or alcoholism is a

17  contributing factor material to the determination of disability is

18  whether the Commissioner would still find the plaintiff disabled if he

19  or she stopped using drugs or alcohol.  20 C.F.R. §§ 404.1535 (b),

20  416. 935(b).  If the Commissioner finds that the plaintiff's remaining

21  limitations, absent the drug or alcohol addiction, would not be

22  disabling, the Commissioner will find that drug addiction or

23  alcoholism is a contributing factor material to the determination of

24  disability and deny benefits.  20 C.F.R. §§404.1535 (b)(2)(I),

25  416.935(b)(2)(I); <u>see also</u> <u>Sousa</u>, 143 F. 3d at 1245.

26                      **FINDINGS OF THE ALJ**

27    The plaintiff was born July 9, 1965. [AR 104.]  The plaintiff has

28  an eleventh grade education [AR 12, 21, 115] and past relevant work

1 experience which includes work as an office building cleaner,
2 inventory clerk, auto assembler, and materials handler [AR 12; AR 115,
3 120, 132].  The plaintiff alleges that he has been unable to work
4 since March 3, 1994,[1] because of schizophrenia, hearing problems,
5 memory problems, auditory hallucinations, and inability to respond
6 well to others. [AR 104, 119.]

7    The ALJ found that the plaintiff last met the special insured
8 status requirements of Title II of the Act on December 31, 1998.[2]  The
9 plaintiff asserted that he had not engaged in substantial gainful
10 activity since his alleged onset date.  [AR 14.]  The ALJ found that
11 the plaintiff had "severe" mental impairments consisting of a
12 psychotic disorder not otherwise specified with depressive and anxiety
13 features and a history of polysubstance abuse including PCP and
14 cocaine.  However, the ALJ found that the plaintiff had been clean and
15 sober since September, 2002.  The ALJ further found that the
16 plaintiff's abuse of alcohol and drugs was clearly material until at
17 least September, 2002, the date the plaintiff asserts he last used
18 such substances. The ALJ found that the plaintiff never had an
19 impairment or combination of impairments listed in, or medically equal
20 to one listed in, Appendix 1, Subpart P, Regulations No. 4. [AR 12.]
21 The ALJ further found that the plaintiff retained an unlimited

23    [1]The plaintiff alleged an onset date of March 3, 1994, in his
24 application [AR 104] and in one of his Disability Reports [AR 119].
However, in another Disability Report, the plaintiff alleged an onset
25 date of July 12, 1999. [AR 112.]

26    [2]This means that the plaintiff must establish that he has been
27 continuously disabled since on or before that date to qualify for
disability insurance benefits.  Flaten v. Secretary of Health and
28 Human Services, 44 F.3d 1453, 1458 (9th Cir. 1995).  There is no such
insured status requirement for SSI.

- 5 -

exertional residual functional capacity without evidence of any physical limitations. [AR 12, 14.] The ALJ determined that, as of September, 2002, the plaintiff retained the residual functional capacity to perform moderately complex tasks involving four to five steps.  The ALJ found that such work should be object oriented in nature, involving habituated tasks.  The work should not require the safety of others or be fast moving. [AR 12.] The ALJ determined that the plaintiff's testimony at the hearing and his statements of record failed "to credibly establish functional limitations greater than that found" in his decision.  The ALJ, relying upon vocational expert testimony, further found that the plaintiff's residual functional capacity included the ability to perform his past relevant work as an office building cleaner and materials handler.  Accordingly, the ALJ concluded that the plaintiff has not been under a "disability" at any time through the date of the decision. [AR 14-15.]

## **THE PLAINTIFF'S CONTENTIONS**

Shooting with a blunderbuss, rather than a rifle, the plaintiff raises numerous issues:

1) Substantial evidence does not support the ALJ's determination that substance abuse was "material";

2) The ALJ erred by misquoting the evidence;

3) The ALJ erred in rejecting the treating physicians' opinions;

4) The ALJ erred in finding that the plaintiff was not disabled;

5) The ALJ improperly assessed the plaintiff's credibility;

6) The ALJ improperly assessed the plaintiff's residual functional capacity;

7)    The ALJ failed to pose a complete hypothetical question to the vocational expert; and

8)    The ALJ failed fully and fairly to develop the record.

### DISCUSSION

**Misciting the evidence**

The plaintiff contends that the ALJ miscited the testimony of Joseph Malancharuvil, Ph.D., the medical expert called to testify. The plaintiff contends, for example, that the ALJ misquoted Dr. Malancharuvil when the ALJ wrote that the plaintiff suffered from "a psychotic disorder with depressive and anxious features, a personality disorder with anti-social features and, primarily, polysubstance abuse." The plaintiff takes issue with the ALJ's use of the word "primarily."  [Joint Stipulation at 5; AR 13.]

However, the ALJ did not misquote Dr. Malancharuvil.  Although Dr. Malancharuval indicated that the plaintiff, even following prolonged detoxification, could still be left with residual symptoms [AR 48], Dr. Malancharuval, nevertheless, also testified as follows:

A.    All these period [sic] till about approximately nine months ago, the claimant definitely had a significant problem under 12.09. (Substance addiction disorders.)

Q.    12.09?

A.    Yes.

Q.    Okay.

A.    And that's the primary issue that is substantially affecting every other issue in this record, and it's a heavy, heavy objective evidence everybody has diagnosed him with the same problem.  (Emphasis added.) [AR 32-33.]

- 7 -

1    The plaintiff also accuses the ALJ of misquoting the evidence
2  when the ALJ stated that the plaintiff admitted the use of illegal
3  substances until September, 2002.  The plaintiff argues that the he
4  testified that it was "'nine months ago' and the ALJ and ME decided
5  between them that it was September 2002, 'simply accepting without any
6  type of evidence' (AR 34-35).  Thus, it was not plaintiff's admission
7  that he last used drugs in September 2002 and was not acceptable
8  evidence." [Joint Stipulation at 5.]

9    It is not clear why the plaintiff is complaining.  When the
10  medical expert stated that the plaintiff last used drugs in September,
11  2002, "simply accepting without any type of evidence," he was
12  accepting, without any corroborating evidence, the plaintiff's own
13  testimony that he last used drugs approximately nine months prior to
14  the hearing. [AR 35; see AR 27.] Nine months prior to the hearing
15  would have more accurately been August, 2002, but since the plaintiff
16  himself could only give an approximation, there is little
17  significance to the one month difference.

18    Notwithstanding the above testimony, the plaintiff also contends
19  that the ALJ otherwise misstated the evidence concerning the
20  plaintiff's substance abuse.  The plaintiff contends that he testified
21  that he was not using drugs in prison and that he had not used drugs
22  since 1992. [Joint Stipulation at 5, citing AR 37.]

23    However, it is the plaintiff who misstates the evidence.  In
24  trying to explain the inconsistency between the plaintiff's statement
25  to Dr. Smith that he last used substances in 1992 with his testimony
26  that he last used substances approximately nine months earlier, the
27  plaintiff offered the following testimony:
28  \\\

1    CLMT:      I was incarcerated in '92.  I probably did use

2              drugs in '92 because after '92 I was prison [sic] so I

3              was – I was – it was impossible for me to get that type

4              of drug.  What I'm saying, from '92 --

5    ALJ:      Mr. Jenkins, you're telling me that those [sic]

6              are no drugs among prisoners in –

7    CLMT:      Oh, yes, there's drugs in institutions, but as far

8              as me, Your Honor, – you say socially or social smoker

9              or whatever and drugs, I didn't, but as far as me being

10             incarcerated, yeah, I had got involved with drugs.  But

11             as far as me being in society itself, no, not since

12             '92.

13   ALJ:      Okay.  So you're saying that you haven't used

14             drugs out in the free world since 1992 but you did use

15             drugs since 1992 when you were incarcerated?

16   CLMT:      Yeah, incarcerated in 2001 and 2002 I had – I had

17             went to prison, Your Honor, on a violation because of

18             my drug problems and past drug problems. [AR 37.]

19        The plaintiff's contentions that the ALJ miscited the testimony,

20   therefore, is not borne out by the record.

21   **<u>The treating physicians' opinions</u>**

22        The opinion of a treating physician is generally entitled to

23   greater weight than the opinion of a physician who has examined, but

24   not treated, the claimant.  This is so because the treating physician

25   is employed to cure and has a greater opportunity to know and observe

26   his patient than a physician who only saw the claimant on one

27   occasion.  The opinion of an examining physician, in turn, is

28   generally entitled to greater weight than the opinion of a physician

1   who has never examined the claimant.  <u>Andrews v. Shalala</u>, 53 F.3d

2   1035, 1041 (9th Cir. 1995).  This is not to say, however, that the

3   opinion of even a treating physician is "necessarily conclusive as to

4   either a physical condition or the ultimate issue of disability."

5   <u>Magallanes v. Bowen</u>, 881 F.2d 747, 751 (9th Cir. 1989), <u>citing</u>

6   <u>Rodriguez v. Bowen</u>, 876 F.2d 759, 761-62 & n. 7 (9th Cir. 1989).  If,

7   for example, the opinion of a treating physician is rejected in favor

8   of that of a non-treating physician, and the opinion of the non-

9   treating physician is based upon independent clinical findings, the

10  opinion of the non-treating physician can constitute substantial

11  evidence.  It is then for the ALJ to resolve the conflict.  <u>Andrews</u>,

12  53 F. 3d at 1041.  If, on the other hand, the opinion of the non-

13  treating physician is based upon the same clinical findings considered

14  by the treating physician, the ALJ must cite specific and legitimate

15  reasons for rejecting the treating physician's opinion.  <u>Id</u>.

16      The plaintiff contends that the ALJ erred in relying upon the

17  one-time consultative examiner over the opinions of his treating

18  physicians.  The plaintiff's arguments are not persuasive.

19      First, the plaintiff contends that the ALJ wrongfully ignored the

20  diagnoses of the various treating physicians that the plaintiff

21  suffers from "possible" thought disorder, "possible" explosive

22  disorder, "probable" delusional disorder, "possible" mood disorder,

23  adult anti-social personality, borderline personality traits, and

24  paranoid schizophrenia.  However, even assuming that these are actual

25  diagnoses versus "possible" diagnoses, the ALJ is not required to

26  analyze each potential or differential diagnosis advanced.  <u>See</u>

27  <u>Vincent on Behalf of Vincent v. Heckler</u>, 739 F.2d 1393, 1395 (9th Cir.

28  1984) <u>quoting</u> <u>Cotter v. Harris</u>, 642 F.2d 700, 706 (3d Cir. 1981)("The

Secretary, however, need not discuss all evidence presented to her. Rather, she must explain why 'significant probative evidence has been rejected'"). These diagnoses by themselves are neither significant nor probative, and the plaintiff fails to state how these differing diagnoses have any bearing upon the ultimate issue-the degree of functional impairment. Matthews v. Shalala, 10 F.3d 678, 680 (9th Cir. 1993)("The mere existence of an impairment is insufficient proof of a disability"); Beecher v. Heckler, 756 F.2d 693, 695 (9th Cir. 1985)("[T]he psychiatric diagnosis does not necessarily imply that [the plaintiff] subjectively experienced severe and disabling [symptoms]"); Key v. Heckler, 754 F.2d 1545, 1549 (9th Cir. 1985)("The mere diagnosis of an impairment listed in Appendix 1 is not sufficient to sustain a finding of disability").

That the diagnosis itself is not probative is obvious from the very sources cited by the plaintiff. Even when a "possible" explosive disorder was suggested after the plaintiff threatened and harassed staff at a community center[3] [AR 212], the plaintiff himself denied having a violent temper [Id.], and the record indicates generally that he got along well with others and that he behaved appropriately [AR 234, 256, 261; see also AR 205, 223].

Likewise, when adult antisocial disorder was advanced as a diagnosis [AR 219], the plaintiff was described as calm and

---

[3]The plaintiff argues that this incident reflects the plaintiff's "difficulty staying out of prison - not because of his drug use, but because he threatened people at the parole center. . . ." [Joint Stipulation at 12.] However, the plaintiff's testimony suggests that his incarceration "on a violation" was, in fact, due to his "drug problems and past drug problems." [AR 37.] Shortly after his return to prison, the plaintiff related that he had taken "regular, daily cocaine, also uses alcohol and phencyclidine - denies medical problems - last cocaine seven days ago." [AR 224.]

cooperative.  Speech was normal and well-organized.  No abnormal
movements were noted, and although affect was constricted, there was
some range.  The plaintiff at that time displayed no psychotic
symptoms, and there were no indications of suicidal ideation or desire
to harm others.  [Id.]

When the plaintiff was thought to have a "possible" delusional
disorder ("probable residual psychosis per history") [AR 223], he was,
nevertheless, goal-directed.  The plaintiff denied hallucinations or
suicidal or homicidal ideation.  The plaintiff also denied paranoid
ideation.  "No spontaneous delusional material presented" that day.
Behavior was appropriate, and the plaintiff was polite.  It was noted
that the plaintiff was "[a]ble to program" within the general prison
population without clinical contact since June, 1998, and without
medication. [Id.]

Similarly, although the plaintiff was diagnosed with paranoid
schizophrenia in 1996, it was thought to be "mild" [AR 266], and more
recently, even with a diagnosis of psychosis not otherwise specified,
the plaintiff's GAF was said to be 65[4] [AR 205].

The plaintiff also argues that the ALJ erred in relying upon the
report of Dr. Linda Smith, the consultative examiner, because the
treating physicians' opinions cited above are more recent and,

---

[4]Global Assessment of Functioning.  The GAF scale reports a
"clinician's judgment of the individual's overall level of
functioning" which is used in "planning treatment and measuring its
impact, and in predicting outcome."  American Psychiatric Association,
Diagnostic & Statistical Manual of Mental Disorders 32 (4th ed.
2000).
    A GAF of 61-70 indicates "[s]ome mild symptoms (e.g., depressed
mood and mild insomnia) OR some difficulty in social, occupational, or
school functioning . . ., but generally functioning pretty well, has
some meaningful interpersonal relationships."  Id. at 34.

therefore, highly probative, especially when the plaintiff's condition is progressively deteriorating "[as it usually is]." [Joint Stipulation at 11.] However, other than the various diagnoses or "probable" or "possible" diagnoses, the plaintiff fails to state exactly what opinions he believes were wrongfully rejected, and the plaintiff  cites no medical evidence whatsoever that the plaintiff's condition is progressively deteriorating but rather substitutes his own medical opinion that a condition such as his "usually" deteriorates.

Moreover, even if the court were to accept the plaintiff's argument that the more recent opinions are highly probative, the most recent assessments in the record do not support the plaintiff's allegations of disability.

When initially seen following his re-incarceration for violation of parole in 2000, the plaintiff, who had previously been rather insistent that he did not suffer from a mental impairment [AR 260], related a history of depression, withdrawal, anxiety and agitation. Mood was dysphoric, sleep was disturbed, and the plaintiff was not eating well.  Intellectual functioning was assessed to be borderline, and the plaintiff was somewhat tangential.  The plaintiff also reported a history of auditory and visual hallucinations and some generalized paranoid ideation.  There were some memory and attention deficits, and insight and judgment were limited.  However, behavior and speech were within normal limits, as were thought organization, thought quality and reality contact. There was no evidence of suicidality or risk of violence. [AR 213.] The plaintiff, moreover, indicated shortly thereafter that he felt "OK."  Objectively, the plaintiff's speech was coherent, although his vocabulary was simple.

1  The plaintiff was not grossly psychotic, and medications were

2  prescribed.  [AR 212.] A week later, the plaintiff complained of being

3  a "little depressed" with complaints of difficulty sleeping. [AR 210.]

4      When evaluated on September 14, 2000, the plaintiff related that

5  he "sometimes" had auditory hallucinations, and there was indication

6  of a possible learning disability.  Memory was poor, but otherwise,

7  intellectual functioning, organization of thoughts, association of

8  thought, thought quality, and reality contact were within normal

9  limits. [AR 205.] Subsequent entries reveal no complaints [AR 201] and

10  no significant abnormalities [AR 201, 202].  The last treatment entry

11  of December 13, 2000, revealed that the plaintiff reported that he was

12  "doing much better: sleeping more soundly, less anxious."  The

13  plaintiff denied hallucinations and suicidal or homicidal ideation.

14  [AR 196.]

15      This more recent medical evidence of record therefore, does not

16  indicate any significant ongoing change in the plaintiff's condition

17  since he saw Dr. Smith in February, 2000, and the treating

18  psychologist's assessment in September, 2000, is quite consistent with

19  that of Dr. Smith.[5]

20

21      [5]The plaintiff also argues that Dr. Smith's assessment is
    entitled to less weight than that of the treating physicians because
22  Dr. Smith was "board eligible" in psychiatry whereas the treating
    psychiatrists and psychologists were "board certified." [Joint
23  Stipulation at 11-12.]  The plaintiff, however, cites no evidence
    concerning the board certification of the plaintiff's treating
24  physicians.  A review of the record indicates, however, that one of
    the plaintiff's prison psychiatrists was in fact board certified. [AR
25  283.] During the time Dr. Appel treated the patient, his assessment
    indicates a greater degree of dysfunction than as indicated by Dr.
26  Smith.  Dr. Appel's opinion is reflected in his various assessments of
    GAF of 35 to 55. [AR 279-80, 283.] The GAF of 35 is indicative of some
27  impairment in reality testing or major impairment in functioning.  The
    GAF of 55 indicates moderate symptoms or moderate impairment in

1    Therefore, the ALJ did not improperly assess or reject the

2    treating physicians' opinions.

3    **The ALJ's credibility finding**

4    _____ Once the plaintiff has established by objective or clinical

5    evidence the existence of a medically determinable impairment which

6    may reasonably account for the symptoms alleged, although not

7    necessarily the severity alleged, absent affirmative evidence of

8    malingering, the ALJ must cite clear and convincing reasons if he

9    chooses to disbelieve the plaintiff's symptom allegations.  Batson v.

10   Commissioner of the Social Security Administration, 359 F.3d 1190,

11   1196 (9th Cir. 2004).

12   The ALJ found that the plaintiff was not entirely credible

13   citing, inter alia, the plaintiff's inconsistent statements concerning

14   his substance use and the plaintiff's poor work history.

15   The ALJ noted, for example, that the plaintiff's history to Dr.

16   Smith of occasional marijuana use contrasted sharply with the

17   plaintiff's admission to his prison psychiatrist of "regular daily

18   cocaine use," the last use being seven days earlier.  [AR 14; compare

19   AR 163 with AR 224; see AR 283; see also AR 37.] Such inconsistent

20   statements are legitimate considerations in the assessment of

21   credibility.  Fair v. Bowen, 885 F.2d 597, 604 n. 5 (9th Cir. 1989).

22   Although the plaintiff argues otherwise, a poor work history is

23   also a legitimate consideration in the assessment of credibility.

24   Thomas v. Barnhart, 278 F.3d 947, 959 (9th Cir. 2002).  The

25

26   ────────────
     social, occupational or school functioning.  Diagnostic & Statistical
27   Manual of Mental Disorders at 34.  However, it appears that Dr. Appel
     last saw the plaintiff in June, 1996, well before the relevant time
28   period covered by the plaintiff's current applications. [AR 272.]

plaintiff's suggestion that his poor work history is attributable in part to the plaintiff's borderline intelligence is not persuasive in view of the fact that in the past, the plaintiff had been able to perform substantial gainful activity, alleged borderline intelligence notwithstanding. Joint Stipulation at 26.  [AR 107, 132.]

In citing the plaintiff's inconsistent statements and poor work history, therefore, the ALJ provided sufficiently clear and convincing reasons for finding the plaintiff not credible.  <u>Thomas</u>, 278 F.3d at 958-59.

**Exertional limitations**

As part of his arguments concerning the Listings, the correctness of the ALJ's residual functional capacity assessment, and the ALJ's hypothetical to the vocational expert, the plaintiff disputes the ALJ's finding that the plaintiff has no physical limitations.  More specifically, the plaintiff argues that:

1.   The ALJ is required to consider the combined effects of the plaintiff's physical and mental impairments in determining whether his condition medically equals a listed impairment. [Joint Stipulation at 18.]

2.   A non-exertional mental impairment "may still limit what the claimant can do physically, particularly where fatigue is present...."  The plaintiff further argues that "[p]ain is another nonexertional limitation which is not included in the medical vocational guidelines." [AR 28.]

3.   The ALJ failed to include in his hypothetical question to the vocational expert "any exertional limitations resulting from plaintiff's mental impairments and

- 16 -

1  univestigated pain—which was documented in his medical

2  records." [Joint Stipulation at 33.]

3      The plaintiff's arguments lack merit.

4      Although the plaintiff has had some very infrequent complaints of

5  headaches or spinal pain [AR 217, 273], x-rays have been normal [AR

6  245, 287, 291].  While it may be true, as the plaintiff argues, that

7  many musculoskeletal impairments do not show up on x-rays, it still

8  remains the plaintiff's burden to show that he has a medically

9  determinable impairment.  Cotton v. Bowen, 799 F.2d 1403, 1407 (9th

10 Cir. 1986).  The fact that the plaintiff pain was "uninvestigated" and

11 that the plaintiff was never given an MRI merely corroborates the lack

12 of frequency or severity of the plaintiff's symptom complaints and the

13 lack of significant ongoing clinical findings to justify such testing.

14 The plaintiff cited only two references to physical complaints in four

15 years of medical records [Joint Stipulation at 16; AR 217, 273], and

16 the plaintiff did not allege any physical impairment when he filed his

17 applications for benefits[6] [AR 112, 119].  Similarly, the plaintiff

18 did not testify to any physical complaints or limitations at the

19 hearing.  Therefore, lacking the requisite signs and laboratory

20 findings, and even a significant degree of symptoms, there is more

21 than substantial evidence to support the ALJ's conclusion that the

22 plaintiff had no physical impairment, and, therefore, no physical

23 limitations.  20 C.F.R. §§ 404.1508, 416.908.

24 \\\

25 _____

26     [6]The plaintiff did indicate, however, that his workload was
lightened.  The plaintiff states that he worked only three days a week

27 and did not do any heavy lifting. [AR 112.] However, the plaintiff
mentions no condition or even symptom that would reasonably account

28 for any lifting restrictions. [AR 112, 113.]

1    _____The plaintiff's suggestion that his mental impairment results in
2    physical limitations is likewise not proven.  First, the plaintiff
3    cites nothing in the record to suggest complaints of fatigue that
4    would affect the plaintiff's exertional capacities. [Joint Stipulation
5    at 28.]  Likewise, what little reference there is to pain does not
6    suggest a mental etiology. [AR 273.]

7        Accordingly, the plaintiff has failed to establish the existence
8    of a medically determinable impairment, either physical or mental,
9    which would reasonably account for the plaintiff's current allegations
10   of physical limitations.  Thus, there is no combination of physical
11   and mental impairment to consider in assessing whether the plaintiff's
12   condition medically equals the criteria of a listed impairment, and,
13   as the record now stands, there are no physical limitations which
14   should have been included in the hypothetical question to the
15   vocational expert.  <u>Rollins v. Massanari</u>, 261 F.3d 853, 857 (9th Cir.
16   2001)(The ALJ did not err in omitting from his hypothetical question
17   to the vocational expert those limitations that the claimant claimed
18   but failed to prove).

19   **<u>The listings</u>**

20   _____As part of his arguments concerning the primacy of the treating
21   physicians' opinions, the plaintiff suggests that his impairment
22   either meets or equals the criteria of several listings: Listing 12.03
23   for paranoid schizophrenia and other psychotic disorders; 12.04 for
24   affective disorders; and 12.05 for mental retardation. [Joint
25   Stipulation at 14-17.] It is not entirely clear whether the plaintiff
26   is also asserting that he meets or equals the listing for personality
27   disorders which the plaintiff contends was "completely ignored" by the
28   ALJ. [Joint Stipulation at 17.] The plaintiff accuses the ALJ of

substituting his own lay opinion for that of every treating physician." [Id.]

A Listing is met if the plaintiff's impairment satisfies a set of criteria.  The criteria of Listings 12.03, 12.04 and 12.08 are categorized into "paragraph A criteria (a set of medical findings), and paragraph B criteria (a set of impairment-related functional limitations)."  The B criteria of Listings 12.03, 12.04 and 12.08 are identical.  The B criteria requires two of the following:

1.    Marked restriction of activities of daily living; or

2.    Marked difficulties in maintaining social functioning; or

3.    Marked difficulties in maintaining concentration, persistence, or pace; or

4.    Repeated episodes of decompensation, each of extended duration.

In addition to the A and B criteria, for Listings 12.03 and 12.04, there are additional functional criteria (paragraph C criteria) which will be assessed only if the paragraph B criteria are not satisfied.  Section 12.00A, Appendix 1, Subpart P, 20 C.F.R. Part 404.

Listing 12.05 has alternative A, B, C, or D criteria.  The D criteria of 12.05 incorporates the functional limitations required of the B criteria of 12.03, 12.04 and 12.08.

The plaintiff's impairment, therefore, will be found to meet Listings 12.03, 12.04 or 12.08  "if the diagnostic description in the introductory paragraph and the criteria of both paragraphs A and B (or A and C, when appropriate) of the listed impairment are satisfied."  Section 12.00 A, Appendix 1, Subpart P, 20 C.F.R. Part 404.  In the \\\

case of Listing 12.05, the plaintiff will be found to meet the Listing if either of the A, B, C or D criteria are met.

Although the plaintiff argues that his impairments are of listing-level severity, he fails to state how his impairments meet any of the cited listings.  Rather, the plaintiff does little more than cite some scattered references to intermittent findings in the record and recite the criteria of the listings.  For example, the plaintiff cites references to his delusions concerning the implantation of various objects into his body when he was incarcerated in the County Jail in 1994. [Joint Stipulation at 12.] Presumably, the plaintiff is arguing that the plaintiff, therefore, meets Listing 12.03.  However, even when the plaintiff was tentatively diagnosed with schizophrenia in 1995, the differential diagnosis included drug induced hallucinosis.  In any case, and regardless of the diagnosis, the plaintiff's GAF was assessed as 55,[7] which indicates only moderate symptoms, and the plaintiff was observed to be functioning "quite well" in the general prison population. [AR 283.] Therefore, even assuming that the plaintiff met some of the "A" criteria of the listings, clearly, when his condition was more severe prior to the relevant period covered by his application,[8] the record, albeit with some conflicting evidence [AR 276], does not indicate that the plaintiff had "marked" limitation in activities of daily living or

_____

[7]A GAF of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning...." Diagnostic & Statistical Manual of Mental Disorders at 34.

[8]The relevant period would begin in 1998.  This is because the plaintiff's first month of eligibility for Title II benefits would be December, 1998, one year before the date of filing.  20 C.F.R. 404.621(a)(1); 20 C.F.R. 404.1512(d)(1) and (2).

1  social functioning. [See AR 237 (going to yard, going to classes),
2  248, 256, 261, 268, 275, 278.] There is, moreover, no evidence of
3  ongoing or marked difficulties in maintaining concentration,
4  persistence or pace, another of the "B" criteria of Listings 12.03,
5  12.04, and 12.08 despite some indication of memory and concentration
6  and attention deficits. [See AR 223 (completed auto body program); see
7  also AR 234, 237; AR 164, 205, 222.]

8      As an alternative to the "B" criteria, Listings 12.03 and 12.04
9  have "C" criteria which are met if there is a documented history of a
10  psychotic disorder or chronic affective disorder "of at least 2 years'
11  duration that has caused more than a minimal limitation of ability to
12  do basic work activities, with symptoms or signs currently attenuated
13  by medication or psychosocial support, and one of the following:  1.
14  Repeated episodes of decompensation, each of extended duration; or 2.
15  A residual disease process that has resulted in such marginal
16  adjustment that even a minimal increase in mental demands or change in
17  the environment would be predicted to cause the individual to
18  decompensate; or 3. Current history of 1 or more years' inability to
19  function outside a highly supportive living arrangement, with an
20  indication of continued need for such an arrangement."  The plaintiff
21  cites nothing in the record to indicate that he meets or met the "C"
22  criteria.

23      As to Listing 12.05 for mental retardation, the plaintiff has
24  never been diagnosed as mentally retarded.  The only instance that the
25  plaintiff cites as evidence of marked difficulties maintaining
26  concentration, persistence, or pace was his presentation at the
27  hearing. [Joint Stipulation at 17.] Although the plaintiff was
28  admonished to remain focused [AR 49], there is no indication of

"[m]ental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded" (Listing 12.05A).  Likewise, there is no documentation of I.Q. testing as required to meet 12.05B, 12.05C or 12.05D.

As to the issue of whether the plaintiff's impairment medically equals the criteria of a listed impairment, other than arguing that the ALJ must take the combination of the plaintiff's physical and mental impairments into consideration in determining  medical equivalence (supra), the plaintiff fails to cite what Listing he believes he equaled, and he fails to refer to any evidence in the record to indicate that a Listing is equaled.  Lewis v. Apfel, 236 F.3d 503, 514 (9th Cir. 2001)(". . . . Lewis has offered no theory, plausible or otherwise, as to how his [impairments] combined to equal a listed impairment").

This being said, however, because the record lacks two and one-half years of updated records, substantial evidence supports the ALJ's finding concerning the Listings only through December, 2000, the date of the last treatment record.

**The plaintiff's residual functional capacity**

The plaintiff argues that because the ALJ improperly rejected the plaintiff's subjective complaints and the opinions of his treating physicians, the ALJ's residual functional capacity assessment is flawed. [Joint Stipulation at 28.] However, the ALJ cited clear and convincing reasons supported by substantial evidence to support his credibility finding, and the ALJ properly weighed the evidence provided by the plaintiff's treating physicians.

1    Nevertheless, a reassessment of the plaintiff's residual

2  functional capacity will have to be made because the ALJ never

3  properly made an assessment of residual functional capacity for the

4  period prior to September, 2002 (infra) and because the record is

5  inadequately developed for the period after December, 2000.

6  **The materiality of drugs and alcohol**

7    The plaintiff cites 20 C.F.R. §§ 404.1535 and 416.935 for the

8  proposition that the Commissioner is required "to evaluate which of

9  the claimant's current physical and mental limitations, upon which it

10  based the current disability determination, would remain if the

11  claimant stopped using drugs or alcohol." [Joint Stipulation, at 6.]

12    The plaintiff argues that the ALJ erred by not separating out

13  those impairments which are independent of the plaintiff's substance

14  abuse, arguing that the plaintiff's "personality disorder remains even

15  when he does not use drugs!" [Id.]

16    However, and even if the diagnosis of a personality disorder is

17  accepted, the plaintiff cites no evidence to indicate that such a

18  condition is disabling.

19    This being said, the court nevertheless agrees with the plaintiff

20  that the ALJ's analysis of the materiality of drugs and alcohol is

21  flawed.

22    20 C.F.R. §§ 404.1535(b) and 416.935(b) provide in pertinent part

23  that, where there is medical evidence of drug addiction or alcoholism,

24  the key factor in determining whether drug addiction or alcoholism is

25  "a contributing factor material to the determination of disability" is

26  whether [the Commissioner] would still find [an individual] disabled

27  if [he] stopped using drugs or alcohol."  (Emphasis added.)  In making

28  this determination, the Commissioner evaluates which of the

individual's physical and mental limitations, <u>upon which a current</u>
<u>disability determination is based</u>, would remain if the individual
stopped using drugs or alcohol and then determine whether any or all
of the remaining limitations would be <u>disabling</u>.

Clearly, therefore, the issue of the materiality of substance
abuse only arises when there is first a "determination of disability."
<u>Bustamante</u>, 262 F.3d at 955; 20 C.F.R. §§ 404.1535(b) and
416.935(b)(2004). If the ALJ finds that a claimant is not disabled,
even considering substance abuse, then the claimant is not entitled to
benefits and there is no need to proceed with the analysis under 20
C.F.R. §§ 404.1535 and 416.935.

In the plaintiff's case, there has been no finding that the
plaintiff was disabled. The defendant argues, therefore, that the ALJ
did not make a finding that the plaintiff's drug abuse was "material."
The defendant notes that the ALJ determined at step four that the
plaintiff was not disabled. "Hence, Plaintiff's assertion that the ALJ
found Plaintiff's drug abuse was material to disability is incorrect."
[Joint Stipulation at 8.] In essence, the defendant is claiming that
the ALJ's finding that "[t]he claimant's abuse of alcohol and drugs
was clearly material until at least September, 2002. . . ." [AR 12] is
superfluous. <u>Fastner v. Barnhart</u>, 324 F.3d 981, 986 (8th Cir. 2003).

The problem with the defendant's argument is that while it is
true that the ALJ determined at step four that the plaintiff could
return to his past relevant work, this finding can only pertain to the
period as of September, 2002, because the ALJ specifically indicated
that the residual functional capacity which he found was the
plaintiff's residual functional capacity "as of September 2002." [AR
12.] For the period prior to September, 2002, there is no residual

1  functional capacity assessment whatsoever because the ALJ jumped to

2  the issue of materiality of substance abuse, without consideration of

3  steps four and five.  This was error.  <u>Bustamante</u>, 262 F.3d at 955.

4       Accordingly, the matter requires remand for an assessment of the

5  plaintiff's residual functional capacity prior to September, 2002, and

6  completion of the sequential evaluation procedure.  If the ALJ

7  determines that, even considering the plaintiff's substance abuse, the

8  plaintiff was not disabled at step four or step five, he need not go

9  any further.  If on the other hand, he finds that the plaintiff was

10  disabled during the period the plaintiff was abusing substances, the

11  ALJ must then separate out what impairment would have remained if the

12  plaintiff had stopped abusing substances.  <u>Sousa v. Callahan</u>, 143 F.3d

13  1240, 1245 (9th Cir. 1998).

14       Furthermore, in assessing the materiality of substance abuse,

15  should it be necessary, the ALJ should cite his reasons for his

16  finding of materiality.  The only reasons cited by the ALJ in his

17  decision are that the plaintiff's own statements and history include

18  acknowledgment of the use of substances, but the use of substances

19  alone does not mean that the use was a material factor contributing to

20  disability.  <u>Id.</u> (The lower "court failed to distinguish between

21  substance abuse contributing to the disability and the disability

22  remaining after the claimant stopped using drugs or alcohol. The two

23  are not mutually exclusive").  This court further notes that, even

24  when the plaintiff was "actively delusional" [AR 281], there were no

25  observations by mental health professionals that the plaintiff was

26  then on drugs [AR 266, 281].

27  \\\

28  \\\

**<u>The ALJ's failure fully and fairly to develop the record</u>**

        In Social Security cases, the ALJ has an independent duty fully and fairly to develop the record.  This duty exists even where the plaintiff is represented.  <u>Tonapetyan v. Halter</u>, 242 F.3d 1144, 1150 (9th Cir. 2001).  The plaintiff contends that the ALJ failed in his duty because he failed to order another consultative examination.  The plaintiff points to the medical expert's testimony as support for his contention:

> ME:  Yeah, I just want to make one comment, that we don'**t** have current psychological evaluation.  We don't have what has happened to this claimant since he has become sober, and he has complained that he's disturbed by what he calls voices, and what is its nature and is it a residual psychosis or is it something that will wear out.  We do not know that.  And the extent of his psychiatric difficulties is now assessed from the past and the records go to 2001 – January.  We don't have anything in almost two years.  And so it is maybe possible that we need current examinations with some sort of tests to be fully fair in the assessment of the claimant.  [AR 51.]

        The decision of the ALJ purports to assess the plaintiff's impairment from 1998 through the date of the decision, June 27, 2003.  Although there is medical evidence going back to 1995 and 1996, the most recent treatment entry is dated December, 2000, two and one-half years before the ALJ's decision.

        The plaintiff's attorney attempted to obtain the more recent records, but was unsuccessful.  [AR 20; AR 293.] Although not every

- 26 -

situation where there is a lack of recent medical evidence necessarily requires remand, in the plaintiff's case, much has happened since Dr. Smith's evaluation of February, 2000, and since the last treatment note in December, 2000.  First, the plaintiff was reincarcerated in June, 2000, and then released from incarceration in January, 2001. [AR 194.] Next, while the plaintiff was not under psychiatric care at the time he saw Dr. Smith [AR 162], at the time of the hearing, the plaintiff appears to have had continued regular treatment and medication which was initiated during his most recent period of incarceration. [AR 27, 30.] The plaintiff, moreover, reportedly came to the realization that he had to change his life or return to incarceration in spite of the fact that he claimed that he turned to illicit substances as a form of self-medication.  [AR 44.] The plaintiff claims, therefore, that he has been clean and sober since approximately September, 2002. Nevertheless, despite his claimed ongoing sobriety and regular treatment, the plaintiff's auditory hallucinations have not diminished.  To the contrary, according to the plaintiff, they have become more frequent. [AR 44.] Dr. Malancharuvil did not find that this was unusual, indicating that even with a period of prolonged detoxification, some people remain with symptoms "because they, quote, unquote, broke.  For example, somebody who took drugs and went into a panic attack, they may have a tendency to have panic attacks even when they are sober for years.  Because that memory – something has broken, quote, unquote, as a result." [AR 48.] Additionally, the nature of the plaintiff's auditory hallucinations also appear to have changed somewhat.  The voices the plaintiff hears have been command context hallucinations [AR 28, 205], but the tone of the voices appear to have changed from a benign paternal voice [AR

205] to what the plaintiff described in his testimony as "like Satan" [AR 28].

Granted, the plaintiff may not be a reliable historian. Nevertheless, considering the plaintiff's history of ups and downs mentally [see AR 271, for example] and his more recent history of regular treatment, it cannot be presumed that the plaintiff's condition remained stable in the two and one-half years since his release and since the date of the last treatment note of record. As Dr. Malancharuvil recognized, it is not quite fair in a situation such as this to make an assessment of the plaintiff's condition for the entire period at issue based solely upon past medical records. The ALJ is charged with conducting a full and fair hearing such that the interests of both the plaintiff and the Commissioner are adequately represented. Boettcher v. Secretary of Health and Human Services, 759 F.2d 719, 722 (9th Cir. 1985).

Accordingly, this matter requires remand for updated medical evidence either in the form of the updated treatment record, if it is now locatable, and/or a psychiatric or psychological consultative examination. Because of the references to borderline intellectual functioning and organic brain syndrome [AR 205, 283; see also AR 212-13], psychological testing should also be performed.

Upon remand, the ALJ should reassess the plaintiff's residual functional capacity taking into consideration updated medical evidence. The ALJ should follow the sequential evaluation procedure considering all of the plaintiff's impairments, including that of substance abuse. If the ALJ determines that the plaintiff is disabled, then the ALJ should proceed to analyze whether the plaintiff's substance abuse was material to the determination of

disability by separating out what limitations would remain, absent the
substance abuse.  A vocational expert should again be called.

### ORDER OF REMAND

The Court has reviewed the pleadings, Joint Stipulation of the
parties, and the transcript of the record.  In accordance with the
foregoing discussion, the magistrate judge finds that good cause has
been shown for remanding the case to the Commissioner.

IT IS ORDERED that this case be remanded to the Commissioner of
the Social Security Administration pursuant to sentence four of 42
U.S.C. section 405(g) for further administrative proceedings
consistent with the reasons set forth herein.

Dated: October 7, 2005


_____/s/_____
JAMES W. MCMAHON
United States Magistrate Judge

_____

_____